## Mine Hill and Schuylkill Haven Railroad Company *versus* Lippincott.

1. Where a railroad company has the right of way over mining lands, and covenants with the owner thereof that upon notice it will change its location, or permit the coal underneath the way to be mined, a tenant of such owner—the terms of whose lease give him the right to mine all the coal in the land demised—may sue in the name of the landlord for breach of such covenant.

2. The removal of the railroad to another location on the same land in such a case, was merely contractual, and involved no exercise of the power of eminent domain, and is not within the decisions holding that the power of location when once exercised, is exhausted, and the railroad was therefore liable in damages for the breach of its covenant.

3. The measure of damages under such circumstances was the value of the coal which was left standing, so as not to let down the surface, and a verdict for these damages *in solido*, may be apportioned by the jury between the landlord and the tenant.

4. The tenant under the terms of such a lease does not part with his right to damages for the breach of covenant on the part of the railroad, because he had sold " all of his right, title and interest" in the colliery.

5. The fact that the landlord, after suit commenced by the tenant, released all his right under his contract with the railroad company, would not affect the right of the tenant, but would reduce that portion of the verdict which in the apportionment by the jury was allowed to the landlord.

March 22d 1878.  Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and TRUNKEY, JJ.

Error to the Court of Common Pleas of *Schuylkill county :* Of January Term 1876, No. 97.

Covenant by Joshua Lippincott, James Dundas Lippincott, executors of James Dundas, deceased, and the Philadelphia Trust, Safe Deposit and Insurance Company, administrator *d. b. n. c. t. a.*, of William Richardson, deceased, for the use of William Verner, against the Mine Hill and Schuylkill Haven Railroad Company. The Ashland extension of the Mine Hill and Schuylkill Haven Railroad, which was authorized by the Act of March 18th 1852, Pamph. L. 166, was built and in operation in 1855.  It crossed, near the centre, a tract of land owned by Dundas and Richardson, called the Catharine Groh tracts, which consisted of about four hundred acres, situated in Cass township, in Schuylkill county.

On the 20th of February 1855, the following agreement was entered into by the parties thereto :

It is agreed between the Mine Hill and Schuylkill Haven Railroad Company of the first part, and James Dundas and William Richardson of the second part, owners of all that tract of land situated in Cass township, Schuylkill county, containing upwards of four hundred acres, warranted in the name of Catharine Groh, conveyed by sundry conveyances to the party of the second part.

1. The party of the second part, owners of the real estate, hereby release the party of the first part of and from all claims and

demands for damages now recoverable by reason of the use and occupation of the surface of the ground by the party of the first part, for the construction of their extended railroad as now built across the Broad Mountain to Ashland; and the right of way over and upon the said premises along the line thereof, not exceeding in width two and one-half rods on each side, measuring from the centre of the graded surface of the road. And the said party of the second part further agrees, that the said party of the first part may, at convenient water-stations, to be by them erected, use so much of the water for locomotive engines as may not be required for mining, steam-engines, or domestic purposes, by the tenants or occupants of the land of the said party of the second part.

2. The party of the first part agree that all the coal in the land over which the said railroad passes may be mined by the tenants of the party of the second part, as though the said railroad had not been constructed thereon.

3. That when, or so soon as the tenants of the said party of the second part are about to mine coal under, or so near to the said railroad that the mining may reasonably be expected to affect the surface of the ground, then the said party of the second part, or their agents, or the said tenants, shall give notice thereof in writing to the said party of the first part, or their agents; and the party of the first part, upon receipt of such written notice by the tenant or any other person authorized by the party of the second part, will take such measures as to the said party of the first part may seem proper to protect their road from all damages by reason of the mining by the tenants of the party of the second part, and so adjust, secure and maintain the same that the said party of the second part may by their tenants be at liberty to mine and remove the coal to the same extent to which it could be done if the said railroad had not been built.

4. That upon receiving such notice, all the measures necessary for the protection of the said railroad as above stated, and so that the liberty to mine said coal shall not be interfered with, shall be taken at the expense of the said party of the first part, and they shall have the right to enter the mines with the view to examine the condition thereof from time to time, not interfering with the mining thereof.

5. That if upon such mining or removal it shall not be found reasonably convenient to protect or preserve the said railroad in its present position and location, then it shall be lawful for the party of the first part, and they shall have the right to place or relay the same upon the nearest adjacent lands of the party of the second part suitable for such purposes, not affecting thereby any improvements made at the time of such removal; and the party of the first part shall enjoy upon the route so taken, and without claim for right of way, the same rights and privileges and under the same restric-

[Mine Hill, &c., Railroad Co. *v.* Lippincott.]

tions as are herein contained with respect to the line now occupied by them.

6. The party of the first part hereby indemnify the party of the second part, their agents and servants, from all loss or damage of any nature whatsoever which can or may happen to said railroad, or to any person or property whatsoever, using or being conveyed thereupon, by reason of any defect or imperfection in said railroad occasioned by the mining and removing of said coal; but the same shall be wholly borne by the party of the first part.

For the faithful performance of the covenants and agreements herein contained the said parties do bind themselves each to the other, their respective successors and assigns.

Prior to the construction of this extension, Dundas & Richardson had leased the coal veins in this tract to John Stanton and others, who worked the same for a considerable period of time before and after the construction of the said extension, and took out large quantities of coal.

Their successors were Andrew McFarland and Thomas Verner (a brother of the said William Verner), who were in possession and working this colliery at the time of the execution of the agreement of 20th February 1855, and mining coal from under the said railroad, leaving pillars for its support, and also for the support of the mines.

These tenants were sold out by the sheriff, and the lease purchased by one William Morton, who was recognised by Dundas & Richardson as their tenant. After being in possession of the colliery about nine months he surrendered his lease and premises to his landlords, who, on the 11th September 1858, by articles of agreement, made a lease to William Verner, the party for whose use this suit was brought.

This lease, among others, contained the following recitals:—

"Whereas, the said parties of the first part are the owners of a tract of coal land, known as the "Catharine Groh Tract," of the county of Schuylkill, and that part of the said tract and veins of coal thereon constituting the Glen Carbon Colliery had been by them leased to Andrew McFarland and Thomas Verner, brother of the said William, whose rights and term were subsequently sold to a certain William Morton, who failed to conduct the same in accordance with the terms of their lease; the same was sold to and surrendered to them, the said parties of the first part; and it is now proposed to lease the same colliery to the said William Verner, subject to the payment by him of the back rents and debts due from the said William Morton to them, the said parties of the first part. It is therefore covenanted and agreed that the said parties of the first part hereby lease to the party of the second part the said colliery and the right to mine coal from the south vein in which the slope now is, the Daniel and Jugular veins, north, and

[Mine Hill, &c., Railroad Co. v. Lippincott.]

the three veins of coal next south of the said south vein of coal, for the full end and term of five years from and after the first day of September, instant.

"And the said party of the first part hereby leases with the said veins of coal and colliery aforesaid, the use of all the railroads and fixtures of every description belonging to the said colliery, and the twenty-two blocks of miners' houses and the dwelling-house and store, stabling, &c., at the said colliery belonging to them, together with all of the horses, mules, drift and other cars, wagons and tools and personal property of every description now at the mines, to have the right to use and enjoy the same for the purpose of conducting the said colliery for the full end and term aforesaid, to be kept in good order and condition by the party of the second part during the term aforesaid, natural wear and tear only excepted. And in consideration of the lease of the colliery, fixtures, railroads, houses and personal property aforesaid, the said party of the second part covenants and agrees to pay to the parties of the first part, at the end of every month during the said term, thirty-two cents per ton for every ton of coal mined and shipped from the mines, of any size above the size of chestnut coal, and for chestnut coal the sum of twelve and a-half cents per ton, scale weight, on the respective railroads, and which the same may pass, but at no time shall the amount of chestnut coal exceed ten per cent. of the whole amount of coal mined and shipped. And it is further agreed between the parties that the relation of landlords and tenant shall exist between them, and that the parties of the first part shall have the right to issue their warrant of distress, and seize and take any property of the party of the second part found anywhere upon the said 'Catharine Groh tract' of coal land in payment of any back rent due and unpaid, including the said extra ten cents per ton, to be paid in discharge of the debts aforesaid.

"And it is further agreed between the said parties that the said party of the second part shall in every year during the said term pay rent, which shall at the least be equivalent to the rent on thirty thousand tons of coal, and on as much more as he may reasonably mine by an energetic and diligent working of the said colliery. And the said party of the second part shall at all times work the said mines, timber and support the gangways, and do all other acts appertaining to the working of the same in the most approved manner, so as to facilitate the taking out of all of the coal in the different veins with the least possible waste, and to see and detect any imperfect working of the same. The parties of the first part, by their agents or mine inspectors, shall at all times have the right to go into every part of the said colliery.

"And it is further agreed between the said parties that the working of the said veins of coal here leased are not to be worked in such manner as to interfere with the working of any other colliery

[Mine Hill, &c., Railroad Co. *v.* Lippincott.]

now leased by the parties of the first part to any other parties on the same tract of land; but is expressly granted, subject to the rights of all other parties as they now exist, on the same tract of land.

" And it is further agreed between the said parties that this term, or any interest therein, is not to be assigned or transferred by the said party of the second part, without the written consent of the parties of the first part."

Under this lease Verner took possession of the colliery and worked the coal veins, mining in the usual· manner.   On the day of its date, he sent the following notice to the superintendent of the railroad company.

" Glen Carbon, 25th Nov. 1859.

R. A. WILDER, Esq. :

Dear Sir : I intend to commence to mine coal in the Back or Daniel vein .of my colliery, on Monday, 28th inst., and as the mining of the coal may interfere with your railroad, you will please keep a watch on it, as the road is on the crop of the vein.

Yours respectfully,

WILLIAM VERNER."

Mr. Wilder testifies that between 1859 and 1865, "Mr. Verner often told me he intended to remove the coal, and that we should take measures to protect the road.   I always replied to him that it would be exceedingly dangerous to the road to have the coal removed while the road was used, owing to the peculiar situation of the road to the outcrop, and that if he attempted to remove it until some plan was sanctioned by the company, .I should have all parties engaged in it arrested.   The company never made any attempt to work for the purpose of changing the road, but we made a thorough examination to see if it was practicable to make a relocation at that point; we found it impracticable, and, therefore, did not make any. * * * The cost of bridges would be worth more than the coal."   In 1864, the Philadelphia and Reading Railroad Company, having become the lessees of the Mine Hill and Schuylkill Haven Railroad Company, instituted proceedings against Verner to prevent his mining so as to endanger the safety of the road, and an injunction was obtained against him, which has never been dissolved.

On the 25th April 1870, on motion a rule was granted by the court on plaintiffs' counsel to file their warrant of attorney in this case, before proceeding further therein.

On 23d May 1870, warrant of attorney from William Verner *only* was filed.

On 5th June 1870, the affidavit of George J. Richardson was filed, setting forth that he was one of the executors of William Richardson, deceased, who was one of the plaintiffs in this suit.   That neither he, nor, as he believes, his co-executor, nor the said William

[Mine Hill, &c., Railroad Co. v. Lippincott.]

Richardson, in his lifetime, ever authorized William Verner, or any person for him, to bring this suit. And on the 9th September 1870, the court discharged this rule.

At the trial the following paper was put in evidence.

"I have this day sold my right, title and interest in the Glen Carbon Colliery to Geo. S. Patterson & Brother for sixty thousand dollars—two thousand dollars which I have this day received; four thousand more to be paid on Monday, the 26th of September; twenty-six thousand to be paid on the 1st October 1864, and the balance in thirty days from the first of October 1864. It is agreed that if the payments are not made as above the money paid will be forfeited.                          WM. VERNER,
                                     GEO. S. PATTERSON & BRO.

Philadelphia, September 21st 1864."

And the following receipt:

"Philadelphia, September 21st 1874.

Received of George S. Patterson & Brother two thousand dollars on account of my interest in the Glen Carbon Colliery, together with the following personal property and real estate: Eleven mules, three horses, two carriages, one sulky, harness, wagons for hauling lumber, frame stable, carriage-house, carpenter and smith shop, tools for the same, forty-six drift wagons, three iron dirt trucks, screws and tools for the same, two large wire-ropes, from four to five miles of T railroad iron, coal mined in mines, four houses, one fire-proof safe, lot of timber for mining purposes, three iron air stacks, the timber right of eighty acres of land adjoining the property, breaker and engine belting, and all belonging to the breaker.
    $2000.                              WM. VERNER."

In relation to these papers, George S. Patterson testified: "We thought we had purchased all of Mr. Verner's personal property and interest in the colliery, but we knew that we did not purchase any lease from Verner; we thought we had acquired all Mr. Verner's rights; I don't remember whether those pillars were mentioned in that lease or not; we did not buy any claim that Mr. Verner had against the Mine Hill and Schuylkill Haven Railroad Company for damages; at the time we purchased it was not impossible, but it would not have paid us to take out the pillars in the Crosby vein, if we had the right; the gangway was down at some places; I think Mr. Verner and my brother Edward were present at the time when I said to Mr. Verner that "we did not want to buy a lawsuit."

With the evidence produced by the defendants was an assignment of the surviving executors of Richardson and Lippincott, deceased, to the Philadelphia and Reading Coal and Iron Company of all their rights under the original agreement with the company.

[Mine Hill, &c., Railroad Co. *v.* Lippincott.]

The plaintiffs submitted the following points; to which are appended the answers of the court:

1. That under the agreement of 20th February 1855, and the demise of Dundas & Richardson to William Verner, he became entitled to compensation for any damage that he might sustain as tenant by reason of any pillars that he was obliged to leave unmined to support the Ashland Extension of defendants' road, and the refusal or neglect or failure of the defendants, after written notice of the said Verner to take measures to protect their road or remove the same, so that the said Verner might mine out his coal as if the railroad had not been built thereon.

Ans. "We think this is so."

3. That if the jury find that written notice was given by William Verner to the Mine Hill Company, or that said company, by their acts or declarations, waived notice in writing that the said Verner was about to mine out the coal from under their road, and that he, the said Verner, desired the defendants to protect their road so that he could mine out his coal under the same, and the defendants refused to support or remove their road, so that such coal could be so mined, the plaintiffs are entitled to recover the value of said coal to Verner as a tenant, as well as themselves as landlords, as it was in the pillars at the time of such refusal, together with the interest thereon from the time of such refusal to the present.

Ans. "The landlords can only recover the rent. Verner can recover such damages for breach of covenant as are direct and proximate, and are not remote and speculative."

4. That the plaintiffs are entitled to recover, not only the loss to Verner, the tenant, but also the damage or loss to them in the rents, which would have been payable upon the coal which the tenants were obliged to leave unmined to support the road of the defendants.

Ans. "We answer this point as we have the third one, with this addition, that if you find anything due Verner, he would be entitled to interest on it from the time the injury was committed."

Among defendants' points, with the answers of the court, were the following:

2. That the railroad company having located the road across the Catharine Groh tract before the execution of the agreement of 20th February 1855, the power to locate was exhausted and could not be exercised by the company, even with the consent of Dundas & Richardson. The agreement to change the location and track of the road, to avoid the outcrop of the coal veins, was an agreement to do what the company had no right to do. It was in violation of law, and void.

Ans. "After a railroad is located its power, in this respect, under a charter, is exhausted, unless the change becomes necessary for the public safety and travel. By consent of the landlords in

[Mine Hill, &c., Railroad Co. v. Lippincott.]

such case, since the passage of the Act of April 11th 1862, Purd. Dig. 1221, pl. 45, this can be done for a short distance."

4. That the covenants in the agreement of 20th February 1855, between Dundas & Richardson and the Mine Hill and Schuylkill Haven Railroad Company, were personal covenants, and no action for a breach of them by the railroad company can be sustained by the lessee of Dundas & Richardson, and as Verner has shown no other right of action than his lease, which expired in the fall of 1863, and was granted subject expressly to the rights of all other parties, as they existed at the granting thereof upon the Catharine Groh tract of land, the verdict should be for the defendants.

Ans. "Whether the covenants in the agreement referred to be personal or not, is immaterial, as Dundas & Richardson's executors are on record as plaintiffs in this suit. Verner can only recover for such interest as he can show was conveyed to him, or that he sustained."

5. That the plaintiffs have proved by Thomas Verner that he was a tenant, and worked the water level gangways in the Crosby and Daniel veins, and gave written notice as such lessee of his intentions to remove the pillars of coal under the railroad in said gangways. That if such evidence is believed, the plaintiff, William Verner, would have no right of action for the pillars of coal in the upper level of said veins, and had no right to interfere with them, and if he has failed to show any other right to damages for any other coal, the verdict must be for the defendants.

Ans. "We affirm this point, subject to our general charge."

The part of the general charge that referred to this point, is as follows:

"Nor can he (Verner) recover damages sustained by Stanton, Thomas Verner or Morton, under the evidence in this case."

7. That William Verner gave no notice under the evidence in this case, which was in compliance with the agreement of 20th February 1855, of his intention to mine coal that would interfere with defendants' railroad, until he gave the notice in evidence of the 6th day of June 1864, and there is no evidence in this case that the defendants or any of their agents interfered with his mining thereafter, or that he was in anywise prevented from mining coal before his sale to Patterson & Bro., in September thereafter, and the verdict of the jury must be for the defendants.

Ans. "The facts contained in this point are questions for the jury to determine under the evidence."

8. That William Verner, the use party plaintiff, having sold all his right, title and interest to the Glen Carbon Colliery, and personal property connected with the same to George S. Patterson & Bro., as per agreement of 21st September 1864 (such having been made before this suit was brought), without any reservation of the pillars of coal under the railroad, his rights, whatever they were in

respect to said coal, passed to his vendees, and he cannot maintain this action.

Ans. "So far as the defendants are concerned, this is immaterial, so long as they have the legal plaintiff on the record."

9. That under the contract of February 20th 1858, there could not be a recovery for a breach of said contract, beyond the injury done thereby to Dundas & Richardson, the parties of the first part, and their damages could not exceed the amount of rent which they would have secured from the coal if taken out by their tenants.

Ans. "We think if Verner can recover at all, he can recover damages sustained by him independent of the rent of the landlords, if they follow a breach of the agreement, and if they are the proximate consequence of the injury, not remote or speculative. The damages of the landlords could not exceed the rent of the coal if taken out by the tenant.

10. That upon all the evidence in the cause, the verdict should be for the defendants.

Ans. "We decline to instruct you as requested."

In the general charge the court, inter alia, said :—

["William Verner is the real plaintiff in interest in this action * * * this action is in the names of the legal plaintiffs for the use of Verner; he must bring his suit in this way. * * * If you find in favor of the plaintiffs, you will determine how much is due to the landlords, and how much is due to William Verner, and state the same in the nature of a special verdict."]

"The notice required by the agreement must be in writing, but the defendants may waive the written notice and accept of a verbal notice, but under the terms of the agreement there must be some notice, and that of a nature to inform the defendants of the plaintiffs' intention to mine the coal in the pillars under the road-bed. [A notice to let down the road in case the defendants would not pay, such as John D. Brennen testifies to, is insufficient unless the defendants understood it as a notice under the terms of their agreement. If they did not so understand it, it would not be notice as required.]

"The first question, then, for the jury to determine is whether the defendants have broken any of their covenants with Dundas & Richardson. [If they have not, that ends the case, and your verdict should be for the defendants. If you find differently, then you will inquire whether the plaintiffs have given the defendants the proper notice, as required by the agreement.] If they have, then the defendants would be entitled to a reasonable time to perform their covenants, and reasonable time depends upon the work to be done. If there has been a failure or refusal on the part of the defendants to comply with their agreement, then you will determine if Mr. Verner or plaintiffs have sustained injury, and if so, how much. The measure of damages would be the coal in place at the time of the injury.

[Mine Hill, &c., Railroad Co. *v.* Lippincott.]

This you will have to determine from the evidence in the case. If you find in favor of the plaintiffs, you will determine how much is due to the landlord and how much is due to William Verner, and state the same in the nature of a special verdict.".

The verdict was for plaintiffs for $52,088, " of which $8334.33 is for rent." A rule to set aside the verdict and enter judgment for the defendants, *non obstante veredicto*, was subsequently discharged. The defendants then took this writ, their assignments of error being the refusal to make absolute the rule upon plaintiffs' counsel to file their warrant of attorney ; the discharge of the rule to enter judgment *non obstante veredicto*, the answers to the foregoing points, and the portions of the charge embraced in brackets.

*William B. Wells*, *John W. Ryon* and *Benjamin W. Cumming*, for plaintiff in error.—The defendants, to protect themselves, had the right to demand *in limine* the authority of Verner to use the names of the legal plaintiffs, and the proceedings should have been stayed until such authority was shown : Mississippi C. Railroad Co. *v.* Southern Railroad Association, 28 Leg. Int. 309 ; Meyer *v.* Littell, 2 Barr 177 ; Montgomery *v.* Cook, 6 Watts 238 ; Hamilton *v.* Brown, 6 Harris 87 ; Armstrong *v.* City of Lancaster, 5 Watts 68. The tenants were not parties to the agreement of 1855, and they have no right, either in their own name, or those of Dundas & Richardson, for any breach of covenant contained therein. The right of action was vested in the landowners prior to the lease to William Verner, and the latter acquired no right of action by virtue of his lease which he accepted, subject to all the rights then existing.

If William Verner had a right of action for pillars of coal left to support the railroad, it follows that all the tenants who preceded him and left pillars of coal for the same purpose, had also their respective rights of action against the railroad company, a result not intended by either of the parties to this agreement, and contrary to its true construction. The profits 'that might accrue to the several successive tenants from mining the pillars of coal necessary to be left in the mines for the support of the railroad, are not within the letter or spirit of this agreement. The landlords alone were to be benefited, and the only damage resulting to them was the non-payment of the rent for the coal necessary to be left for the support of the railroad.

Where the interest of the plaintiff was not intended to be protected or covered by the covenant he cannot recover, notwithstanding the terms of the covenant may include him. De Bolle *v.* Pennsylvania Ins. Co., 4 Whart. 74, 75 ; Maule *v.* Weaver, 7 Barr 329, 331, 332, 333.

But if the covenants contained in this agreement are covenants

[Mine Hill, &c., Railroad Co. *v.* Lippincott.]

running with the land, then, inasmuch as the land has been con-. veyed by the executors to the Philadelphia and Reading Coal and Iron Company, together with this agreement and all rights of action under it, it follows in this aspect of the case, the tenants would have no right of action under said agreement.

Then again, in section third of said agreement it is stated that the said company shall "so adjust, secure and maintain the same (railroad) that the said party of the second part may, by their tenants, be at liberty to mine and remove the coal to the same extent to which it could be done if the said railroad had not been built." It manifestly appears, therefore, that the covenants alleged to have been broken were not made for the benefit of the tenants.

We therefore submit that Verner could not be placed upon this record as the equitable party, when his interest, if any interest he had in the covenant, was a legal interest, and therefore the double recovery allowed in this action was in contravention of all recognised forms of pleading: 1 Chitty's Pleadings 3.

The owner of coal lands over which a railroad passes, being a public highway, will not be permitted to work out all the coal beneath the road bed, so as to cause the ground to subside and thus endanger the lives of the employees and travellers and obstruct public transportation.

The power of the railroad company was exhausted when they located their tract, and they had no authority to change such location to such a distance as would avoid the veins of coal in the Catharine Groh tract. The evidence shows that this railroad had been located, constructed and operated with the consent of the landowners for a period of over one year prior to the agreement of the 20th February 1855, and all the legal obligations and consequences arising from the location of the railroad had become fixed. The re-location of the road, therefore, would have been *ultra vires*, the power of location having previously been exhausted. The Commonwealth alone could confer the right to re-locate: Pierce on American Railroad Law 218; Cleveland and Pittsburgh Railroad Company *v.* Speer, 6 P. F. Smith 334; Morrow *v.* Commonwealth, 12 Wright 307; Holden *v.* Cole, 1 Barr 307; McMurtrie *v.* Stew art, 9 Harris 322; Furniss *v.* Furniss, 5 Casey 15. As to the landowners, no injustice can be done to them, as their original remedy for the use and occupation of the land, if they claim any damages, remains intact and unimpaired, if this contract be annulled: Western Pennsylvania Railroad Company *v.* Johnston, 9 P. F. Smith 290–95.

The right of William Verner, if any he had, grew out of covenants running with the land, and consequently passed with the title to the vendee. The transfer to Patterson was in writing, and shows that he conveyed all his right, title and interest without any reservation.

Patterson therefore succeeded to whatever rights passed under these covenants: Spencer's Case, 1 Smith's Leading Cases 146; Cathcart v. Bowman, 5 Barr 317; Penna. Railroad Co. v. Sly, 15 P. F. Smith 205. The court permitted the jury to assess the damages on the market value of coal in the year 1864 at war prices. The market value was not a fair measure of damages: Fleming v. Beck, 12 Wright 309; Sedgwick on Damages 312.

*G. E. Farquhar*, *F. W. Hughes* and *Edward Owen Parry*, for defendants in error.—The direct consequence of the railroad company not complying with their covenant to protect and secure the railroad from the effect that would be produced by mining, so that the owners of the land, by their tenants, might mine and remove the coal to the same extent as it could have been done if the railroad had not been built, was that the coal in the pillars could not be mined out, and remained in the mines for the support of the road. The damage sustained by the owners of the land, therefore, was the value of the coal that they were prevented from mining out by their tenants, and which might have been mined out by their tenants if the railroad had not been built. The jury have found by their verdict, under a direction from the court, "that the measure of damages would be the value of the coal in place at the time of the injury;" that the damage sustained by the plaintiff was $52,088, of which $8334.23 is for rent. In other words, the jury found that the value of the quantity of coal that was prevented from having been mined out in consequence of the railroad company not keeping their covenant, was $43,753.77 more than the rent that the owners of the land would have been entitled to have received from the tenant under the evidence in the case, if the coal had been mined by the tenant.

The covenant of the railroad company was in terms that Dundas & Richardson, by their tenants, might mine and remove the coal to the same extent to which it could have been done if the railroad had not been built. The contract under Dundas & Richardson by their contract with William Verner, demised to him the coal, and with the demise of the coal they gave him all the rights they possessed for the purpose of removing the coal during the term of his lease. The coal was the property of William Verner, subject to the payment of the reserved rent. If William Verner was prevented from mining out the coal by the act of a stranger, and for which compensation measured by the value of the quantity of coal was paid, the proportion of the compensation to which the lessors would be entitled would be the amount of the rent on the quantity of coal, and the residue the proportion of William Verner.

If the name of William Verner had not been upon the record as the equitable plaintiff in this case, he would, under the evidence, have been entitled to have claimed from the legal plaintiff his pro-

portion of the damages found by the jury, viz., the value of the coal less the rent.

The grant of coal by Dundas & Richardson, for the valuable consideration paid by William Verner, gave him an interest in the covenant and made them trustees for his benefit to the extent of the interest he had acquired in the coal. He had, therefore, as vested an interest in the covenant as the equitable assignee of a bond has in the mortgage which secures the payment of the bond. It is submitted, therefore, he had the right to use the names of the legal plaintiffs in the suit. It is true the owner of coal land over which a railroad passes will not be permitted to work out all the coal beneath the road-bed so as to have the ground subside and thus imperil the safety of the public; but the question here is as to the liability of the defendants upon their agreement. Such a contract would be binding on a private individual, and this railroad is nothing more than a private corporation, and consequently bound: Bonaparte *v.* Camden and Amboy Railroad Co., 1 Bald. 205; Alabama Railroad Co. *v.* Kidd, 29 Ala. 221.

Under the English Consolidated Railway Act of 1845, the same privilege is given to the owner to remove the coal under the bed of the road after notice and failure of the company to purchase: Godefroi & Shortt's Law of Railway Companies 387, § 78. See also Wyrley Canal Co. *v.* Bradley, 7 East 368.

Without doubt the defendants, under their charter, would not be permitted, previous to the Act of 11th April 1862, Pamph. L. 497–8, after locating their road to change it. As against the owner of the land their power was exhausted; for as the exercise of eminent domain is derogatory of private right, the authority must be strictly construed.

But where the company own the land, or act with the consent of the owner, we see no substantial reason why this change should not be made when it is required for public safety. Hopkins *v.* The Great Northern Railroad Co., Godefroi & Shortt's Law of Railway Companies 326.

In order to ascertain the value of the coal in place, the market price of coal at the nearest shipping point where the coal would have been sold during the several years between 1859 and 1864 was given in evidence, and also evidence of the cost of mining, the per centage of loss or waste in mining, and the tolls on the railroad from the mine to the shipping point, from which the jury could determine the value of the coal in the mine. There was no other way in which it could be ascertained. The coal in the pillars was without value unless they could be removed. If they could be removed and the coal sold they were of great value, for the cost of mining them out and placing the coal in the market was but a small deduction from the market price of the coal.

The judgment of the Supreme Court was entered, April 4th 1878,

[Mine Hill, &c., Railroad Co. *v.* Lippincott.]

PER CURIAM.—The effect of the agreement of 20th February 1855, between Dundas and Richardson, the landowners, and the Mine Hill & Schuylkill Haven Railroad Co., was to enable the former and their tenants to mine all the coal and let down the surface, just as if no railroad lay upon this surface. The railroad company was bound, on notice, to take care of its railroad, or remove it to another location on the same land. This removal was merely contractual, involving no exercise of the power of eminent domain, and is not within the decisions holding the power, when once exercised, as gone. The ability of the company to perform either alternative was a matter wholly within its own knowledge, when, for a valuable consideration, it entered into the contract. The contract yielded to the landowners the right of subjacent support of the railroad, and the right to take all the coal underneath. But the railroad being a creation of law for a public purpose, the public right required the subjacent support to remain, if the railroad company refused to perform its contract. The contract thus concerning the public as well as the company, specific performance could not be compelled, and refusal of the company converted the right of the landowners into a right of action for damages under the covenant. The damages necessarily extended to the value of the coal in place, for the whole was lost to them by the refusal of the company to protect or remove its railroad, and the necessity for the subjacent support. This loss is the same, for the whole of the coal in place, whether it arises from the necessity of leaving the pillars as a support of the railroad, or from a conversion of title by payment of the damages. The cause of action therefore arose when the company refused to perform its covenant.

As to Verner, the tenant, there is then no difficulty. He is entitled, for his own use, to that proportion of the damages, to be recovered by the owners of the land, which his lease conveyed under his right to mine—to wit:, to remove, sell, convert and retain after payment of his rent. The verdict is *in solido* for the entire damages, and not two verdicts—one for the lessors, and the other for the tenant. The proportions found by the jury were but for convenient distribution, a thing often done where different rights in the same subject exist. The suit was by the covenantees against the covenantors, and the recovery for the entire value of the coal in place. The right of Verner, as use plaintiff, under his lease, is also clear. His lease was of an old colliery, consisting of several veins, some of which were worked out, leaving only the pillars. No reservation was made as to the extent of his right to mine; but, on the contrary, his lease bound him to work the mines, "and do all other acts appertaining to the working of the same in the most approved manner, so as to facilitate the taking out of *all* the coal in the *different* veins, with the *least possible waste.*" This lease must be interpreted in view of the right of the owners, under their contract of 20th Feb-

5 NORRIS—31

ruary 1855, to take out all the coal and let down the surface, the condition of the old workings where pillars only were left, different veins referred to, covering old and new workings, and the requirement to take out all the coal with the least possible waste. Verner therefore became entitled to the tenant's share of the pillars in the old workings, and was bound to remove them for the advantage of the lessors. · He then was entitled to give the requisite notice to the railroad company to protect or remove its road. He was rightfully a use party, and had an interest his lessors could not revoke or transfer.

This answers also the alleged effect of the release of Richardson to the railroad company in 1872, during the pendency of this action, which was commenced in 1865, against the railroad company. The railroad company had notice of his lease, and could not take a release in the face of the *lis pendens* for the breach of its covenant.

It is alleged, however, that William Verner sold his "right, title and interest in the Glen Carbon Colliery," to George S. Patterson and Brother, on the 21st September 1864, which operated to transfer his right of action. But there is nothing in the writing purporting to convey a right of action for damages already awarded. It purports to pass his title or interest in the colliery, and the other paper of September 21st 1864, passes also the personal property in use in and about the mines. George S. Patterson, the assignee, testifies also that he purchased only the interest of Verner in the colliery and his personal property. He does not remember that the pillars were mentioned, and did not purchase any claim that Verner had against the railroad company; did not want to buy a lawsuit; and did not remember whether Verner stated he had a claim for damages against the company for the pillars. Neither the writing nor the testimony shows a sale of Verner's right of action. None therefore passed to Patterson and Brother. The right to take the pillars did not vest in them, for the same refusal of the railroad company which converted the right to take the pillars into a claim for damages under the covenant, took from Verner the power to pass title to the pillars to his assignee. The pillars remained *ex necessitate* under the higher right of the state, for the support of the railroad; the right to retain them being conclusively fixed by the refusal of the railroad company to permit their removal. This refusal converted the right to mine them into a right of action under the covenant, when Verner gave his notice in 1859, repeated in 1864, before his assignment.

The case has no analogy to a conversion of chattels by recovery of the value. The pillars are part of the realty, and were fixed in their condition by the exercise of the right of eminent domain by authority of the state, as a necessity for continued support beyond the power of the landlords or their tenant to remove them. It was only the contract which conferred the right to mine them, and on the refusal to perform it neither Verner nor his assignee could re-

[Mine Hill, &c., Railroad Co. v. Lippincott.]

move them. The right of action for the damages therefore vested immediately in the covenantees for the use of their tenant. This right of action did not pass by Verner's assignment of the colliery, and if the pillars cannot be mined by his assignee, as we have shown, the injury is remediless, unless Verner can maintain his action in the name of his lessors, the covenantees. Hence, to say that the right to pillars passed to the Pattersons, the assignees of Verner, which could be mined by no one, is illogical and unsound; and to say that possibly at some future day the railroad track may be removed, and the pillars be mined, is to deny to Verner a right he clearly obtained under his lease, and the breach of the covenant, on a pretext, not only illusory, but dependent on the act of the very party whose breach of covenant is the cause of injury to Verner. This in effect would be a denial of justice, on a theory of the merest shadow of a possibility.

But so far as the landlords, Dundas and Richardson, are beneficially interested in the verdict, it is clear that their interest is bound by the release. Hence the portion of the verdict given for *rent* cannot be recovered. The separation of the damages in the verdict enables us to modify instead of reversing the judgment. The sum of $8334.33 is therefore struck out of the verdict, and judgment is now entered for the residue, to wit., $43,753.53, for the use of William Verner, at which sum the judgment is now affirmed.

SHARSWOOD and PAXSON, JJ., dissent from the judgment, not from its modification.